FILED
2014 APR 24 P 4:31
CLERK
U.S. BANKRUPTCY
COURT - PGH

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| MID-VALLEY, INC., et. al., | : | Jointly Administered |
| *Reorganized Debtors*, | : | Case No. 03-35592-TPA |
| | : | |
| NL, INDUSTRIES, INC., | : | Chapter 11 |
| *Movant* | : | |
| | : | Related to Doc. No. 2872 |
| v. | : | |
| | : | |
| MARILYN J. JUDSON, Individually | : | |
| and as Executrix of the Estate of | : | |
| KENNETH JUDSON, deceased, | : | |
| *Respondent* | : | |

Appearances:  Michael G. Zanic, Esq., and David Asigo, Esq. for the Movant
              Carla Guttilla, Esq., and Robert W. Phillips for the Respondent


**MEMORANDUM OPINION**


A hearing on the ***Expedited Motion to Enforce Confirmation Order*** ("Motion") filed by the Movant, N.L. Industries, Inc. ("NLI"), at Doc. No. 2872 was held on March 10, 2014. In the *Motion*, NLI asks the Court to require the Respondent, Marilyn Judson ("Judson") to dismiss it as a defendant from the case of *Judson v. American Optical Corp., et. al.*, Case No. 1222-CC10608 filed in the Twenty-Second Judicial Circuit Court in the State of Missouri ("the State Court Action").[1] In the *Motion*, NLI also seeks an award of sanctions against Judson for violation of the

---

[1] Following the hearing, and without objection by the Parties, the Court entered a temporary stay order as to the State Court Action to maintain the status quo pending a decision on the *Motion*. *See*, Doc. No. 2890.

1

Permanent Asbestos Channeling Injunction ("Channeling Injunction") entered on July 16, 2004, by Hon. Judith K. Fitzgerald, as part of the *Confirmation Order* that approved the *Fourth Amended and Restated Joint Prepackaged Plan* ("Plan") of these reorganized Debtors. *See* Doc. Nos. 1693, 1716.[2]

The Court took the matter under advisement after the hearing, including a determination as to whether an evidentiary hearing might be necessary before a final decision on the *Motion* could be made. Having now given the *Motion* careful consideration, the Court concludes that no evidentiary hearing is required at this time, and that the *Motion* must be denied, without prejudice to being refiled at a later time.[3]

## BACKGROUND

The State Court Action was filed on December 10, 2012, when Kenneth Judson sued a large number of defendants, including NLI, after he was diagnosed with mesothelioma.[4] The

---

[2] Judge Fitzgerald was assigned to the case from the date of its filing in December 2003 until mid-2013 when she retired and the case was reassigned to the Undersigned.

[3] Pursuant to *11 U.S.C. §524(g)(2)(A),* any proceeding that involves the "validity, application, construction, or modification" of the *Channeling Injunction* may be commenced "only in the district court in which such injunction was entered and such court shall have exclusive jurisdiction over any such proceeding." The Court believes, and the Parties have not disputed, that this provision in conjunction with *28 U.S.C. §1334* and the referral of bankruptcy-related matters to this Court by the District Court provide it with jurisdiction to decide this matter. The Court further believes this matter to be a core matter under *28 U.S.C. §157(b)(2)* and intends this to be a final judgment. However, if the District Court determines pursuant to the rationale of *Stern v. Marshall*, ___U.S. ___, 131 S.Ct. 2594 (2011), or otherwise, that this Court does not have the authority to enter a final judgment, then this *Memorandum Opinion* and the accompanying *Order* shall constitute the Court's proposed findings of fact, conclusions of law, and recommendation to the District Court.

[4] Kenneth Judson died shortly after the State Court Action was filed. Marilyn Judson was his wife and in her role as the executrix of his estate, she has continued to pursue the claim on behalf of the estate.

Petition in the State Court Action alleged that Kenneth Judson was employed by NLI at the "Manchester Facility" in St. Louis, Missouri in the period from 1964 through 1968, during which time he was exposed to asbestos fibers, which allegedly caused the mesothelioma.

Shortly after the State Court Action was filed, counsel for NLI contacted Judson's counsel and asked that NLI be dismissed from the case because of the *Channeling Injunction* issued in the present case. NLI's attorney provided some evidence to Judson showing that the Manchester Facility had been part of the Baroid Division of NLI during the relevant period and had manufactured a bentonite-based product called Bentone, which purportedly brought Judson's claim within the scope of the *Channeling Injunction*. On April 29, 2013, Judson agreed to a stipulation of dismissal that dismissed NLI from the State Court Action, without prejudice.

On December 27, 2013, Judson filed a motion in the State Court Action seeking leave to add NLI back in as a defendant. That motion was promptly granted and on December 31, 2013, NLI was again named as a defendant when Judson filed the "Second Amended Petition." The Second Amended Petition alleges that Kenneth Judson worked in a variety of different buildings and departments at the Manchester Facility in which he was exposed to asbestos, the majority of which ("approximately 85%") had nothing to do with the Baroid Division or Bentone. *See Motion at Exhibit H, ¶28.* These other operations allegedly included "the Lead Oxide Department, the Oncor department, lead chemicals, laboratory, storage and offices." *Id.* The Second Amended Petition also includes a statement saying that Judson "disclaims any claim for relief for any portion of the injuries arising out of Baroid-related products or operations and bentonite-mining related products or operations related to NL Industries, Inc." *See Id. at ¶6.*

3

The Parties sharply disagree on how to characterize Judson's action in bringing NLI back into the State Court Action. According to NLI, Judson's actions were based on unsubstantiated factual allegations that were in blatant disregard of, and were designed to circumvent, the *Channeling Injunction*. NLI contends that Judson acted in contempt of the *Channeling Injunction* and should therefore be sanctioned. On the other hand, Judson argues that she initially agreed to the dismissal of NLI from the State Court Action in the mistaken belief, based on representations by NLI's attorneys, that the Manchester Facility was entirely or primarily a Baroid Division/Bentone production plant, and that once she discovered that Bentone was merely a "minority function" of the Manchester Facility she moved to reinstate NLI as a defendant, while respecting the *Channeling Injunction* by disclaiming any liability based on Baroid/Bentone exposure. Even if her position is ultimately found to be wrong, Judson claims she did nothing that would warrant a contempt sanction. NLI disputes Judson's contention that there were operations other than the Baroid Division taking place at the Manchester Facility during the time that Kenneth Judson worked there.

The factual questions of what sort of operations were being conducted at the Manchester Facility from 1964 through 1968, and where in the facility Kenneth Judson may have worked, are obviously key ones. The Parties presented some conflicting documentary evidence in this regard by way of various attachments to their filings. The Court is in no position to make any ultimate factual determination on these questions[5] and sees no need to discuss the content of the

---

5   The Court had originally mused that in order to decide the *Motion* it might be necessary to hold an evidentiary hearing to determine the scope of operations at the Manchester Facility during the relevant time period. Upon further consideration, however, and for the reasons discussed below, the Court does not find that to be necessary after all and will instead defer to the court in the State Court Action to make any necessary factual determinations on that issue.

evidence in any detail, other than to say that it finds that both sides have shown at least a colorable basis for their positions. In light of that conclusion, the Court rejects any contention by NLI that Judson filed the Second Amended Petition without having any factual basis whatsoever for her assertion that Baroid/Bentone operations were only a minority part of the overall operations at the Manchester Facility. Therefore, the Court will not impose any sanctions for contempt against Judson.

Having provided the necessary general background, the Court can now turn to the issues raised by the *Motion* and Judson's *Response*. An initial matter to be considered is whether the *Channeling Injunction* should be found invalid because its scope exceeded the Court's authority to grant. Assuming the first matter is decided in the negative, a second issue exists as to whether the *Channeling Injunction* bars Judson's renewed claim against NLI in the State Court Action.

**LEGAL DISCUSSION**

The *Channeling Injunction* which is the subject of the *Motion* provides in relevant part as follows:

> 39. **The Permanent Channeling Injunction**
>
> (a) Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the discharge both provided by sections 1141 and 524 of the Bankruptcy Code and pursuant to the exercise of equitable jurisdiction and power of this Court under sections 524(g) and 105(a) (or both) of the Bankruptcy Code, the Permanent Channeling Injunction set forth in article 10.3(a) of the Plan shall be, and hereby is, issued and approved as of the Effective Date. Pursuant to the Permanent Channeling Injunction, all Entities which have held or asserted, which hold

or assert, or which may in the future hold or assert any Asbestos PI Trust Claim . . . against any of the Debtor-Affiliated Protected Parties based upon, arising out of, attributable to, or in any way causally connected with, any [Asbestos PI Trust Claim] whenever and wherever arising or asserted (including, but not limited to, all such Claims in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, whether by common law or statute) shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Debtor-Affiliated Protected Party with respect to any [Asbestos PI Trust Claim], including, but not limited to:

(i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any [Asbestos PI Trust Claim] against any of the Debtor-Affiliated Protected Parties, or against the property or interests in property of any Debtor-Affiliated Protected Party, with respect to any [Asbestos PI Trust Claim];

\* \* \*

(v) proceeding or taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the [AsbestosTrust Distribution Procedures]...relating to any [Asbestos PI Trust Claim].

*Id. See also Motion at* ¶6.[6]  NLI contends that it is a "Debtor-Affiliated Protected Party" under the *Channeling Injunction*, and that it has been aggrieved by being named as a defendant in the State Court Action. NLI further contends that Judson may only pursue her claim against it through the Asbestos Trust that was created as part of the *Plan*.

Judson argues that NLI is not itself a Debtor and is being sued because of its own independent acts, not because of its relationship with any of the Debtors. She argues that the *Channeling Injunction* should not be enforced because the Court exceeded its jurisdiction in entering

---

6    The capitalized terms in the above quote are defined terms under the Plan and will be discussed further as necessary below.

it, pointing to *11 U.S.C. §524(g),* which she says does not authorize the issuance of an asbestos channeling injunction to protect non-debtor entities from non-derivative claims, *i.e.*, from claims wherein the non-debtor is alleged to be independently liable to some third party because of its own actions and not merely derivatively liable because of its relationship to the Debtor. *See, e.g., In re Quigley Co., Inc.*, 676 F.3d 45, 59-62 (2d Cir. 2012) (discussing how *Section 523(g)* is intended to allow bankruptcy courts to bar actions against third parties only where the third party has derivative liability due to its relationship with the debtor, and not to enjoin actions if the third party has independent liability). Judson further notes that the Third Circuit has held that *Section 524(g)* establishes the limits of a bankruptcy court's asbestos channeling injunction power. *See In re Combustion Engineering*, 391 F.3d 190, 233-34, 236 (3d Cir. 2004) (rejecting *11 U.S.C. §105(a)* as an alternative basis for entering an asbestos channeling injunction broader than would be permitted under *Section 524(g)*). *See also In re Pittsburgh Corning Corp.*, 417 B.R. 289, 292 (Bankr. W.D. Pa. 2006).

Were the Court able to reach this issue, Judson's argument might well carry the day. The *Channeling Injunction* does, on its face, seem to go beyond the permissible scope of *Section 524(g)* by enjoining non-derivative claims by third-parties against NLI and certain other non-Debtors.[7] However, the time for appeal of the *Confirmation Order* has long since run, and it may

---

7    The *Confirmation Order* which imposed the *Channeling Injunction* stated that it was being entered "pursuant to the exercise of equitable jurisdiction and power of this Court under sections 524(g) and 105(a) *(*or both) of the Bankruptcy Code." It is thus unclear what provision was being relied upon as authority to provide protection for non-debtor parties such as NLI, but to the extent it was *Section 105(a)*, that reliance is questionable under *Combustion Engineering* (which, in Judge Fitzgerald's defense, was not decided until several months after the *Confirmation Order* was entered), and to the extent it was *Section 524(g),* that reliance is at least questionable under the plain language of the statute.

be too late now for the Court to consider whether the entry of the *Channeling Injunction* exceeded the Court's authority. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009).

In *Travelers*, a bankruptcy court entered an asbestos-related injunction order in 1986 and then issued a "clarifying" order in 2004 that some parties argued was actually an enlargement of the scope of the injunction. On an appeal from the 2004 order, the Second Circuit concluded that the bankruptcy court had lacked the jurisdiction and authority to enter the original asbestos-related injunction order in 1986. On further appeal, the Supreme Court held that the Second Circuit erred in that holding because the 1986 order was final, the time for direct review of such order having long-since passed, and none of the recognized exceptions, which would in effect allow a collateral attack on subject matter jurisdiction grounds, applied. If that principle is followed here, it would now be too late for Judson to question the validity of the *Channeling Injunction* almost 10 years after it was entered.

On the other hand, *Travelers* involved the ability of an appellate court to reach the jurisdiction and authority issue, whereas the Court here is being asked to reach that issue with respect to its own prior order. The *Travelers* court did state, in reference to the 1986 order followed by the 2004 clarifying order, that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders." 557 U.S. at 151. It might be argued that this power to interpret and enforce would provide a sufficient basis for the Court to look back and reach the issue of whether there was authority to issue the *Channeling Injunction* to cover non-Debtors such as NLI on the facts presented. While there is some surface appeal to this argument, the Court does not ultimately find it persuasive.

8

It is true that *Travelers* involved an appellate review of the previously-entered injunction. A close reading of the case, however, indicates that the Supreme Court's focus was concerned with protecting the reliable finality of bankruptcy confirmation orders by generally preventing the re-litigation of the jurisdiction of the bankruptcy court to enter the order once the appeal period has passed and the order has become final.[8] The Court believes this same concern would extend to an attempt by the issuing bankruptcy court itself to revisit the jurisdictional issue after the confirmation order has become final. This approach is supported by the approving citation in *Travelers* to *In re Optical Technologies, Inc.*, 425 F.3d 1294 (11th Cir. 2005), wherein that court stated that the need for finality and the respect for the principle of res judicata forbids a bankruptcy court called upon to enforce a final order from trying to "tunnel back ... for the purpose of reassessing prior jurisdiction de novo." 425 F.3d at 1308 (quoted in *Travelers*, 557 U.S. at 154).

Moving on then to the interpretation of the *Channeling Injunction*, the Court begins by again noting that both sides agree that the power to interpret and enforce it resides here. *See*, n. *3, supra. See also, Travelers, supra*; *Confirmation Order* at ¶53. Ideally, of course, any injunction, but particularly a complicated one such as an asbestos channeling injunction, should be so written as to avoid the need for a subsequent interpretation as to its scope. As Judge Fitzgerald herself noted with respect to an asbestos channeling injunction being sought in another case:

---

[8] The Court uses the hedge word "generally" here because there may be circumstances where the jurisdiction to enter a final order was so patently lacking, or for some other recognized reason, that it would be appropriate to revisit the issue despite the order's finality. *See Travelers* at n. 6, 557 U.S. at 153. No such circumstances exist in the present case.

> ... the scope of the injunction must be clearly defined in either the Modified Third Amended Plan or in a confirmation order issued by this court. It is unacceptable to define the scope of the injunction post-confirmation, as the burden to articulate its scope is on the Plan Proponents as a requisite of confirmation. This burden cannot be placed on another party including the parties in interest or the claimants themselves. Instead, it is imperative that the Channeling Injunction be articulated in a way that leaves no doubt as to who and what it covers.

*In re Pittsburgh Corning Corp.*, 453 B.R. 570, 594 (Bankr.W.D.Pa. 2011). Unfortunately, that level of clarity does not appear to have been reached with respect to the *Channeling Injunction* in the present case, hence the Court must do its best to construe its scope.

The proper approach to be followed in construing an injunction was recently explained as follows:

> ... a court should construe the scope of an injunction in light of its purpose and history, in other words, "what the decree was really designed to accomplish." *Mayor of Vicksburg v. Henson*, 231 U.S. 259, 273, 34 S.Ct. 95, 58 L.Ed. 209 (1913). Courts have long looked to "the objects for which
>
> the [injunctive] relief was granted, as well as the circumstances attending it," in deciding whether an enjoined party has complied with an injunction. 2 [J. High, *Law of Injunctions* (4th ed.1905) ] § 1446, at 1455, and n. 68 (citing cases); see also *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (C.A. 2 1942). And they have long refused to "permit defendants to evade responsibility for violating an injunction, by doing through subterfuge a thing which is not in terms a violation, yet produces the same effect by accomplishing substantially that which they were enjoined from doing." *Stodder v. Rosen Talking Mach. Co.*, 247 Mass. 60, 68, 141 N.E. 569, 571 (1923).

*Salazar v. Buono*, 559 U.S. 700, 761-62 (2010) (Breyer J., dissenting). The Court must therefore begin with an inquiry as to why NLI was included within the protection of the *Channeling Injunction* in the first place since it is not a Debtor.

The Court is able to glean a sufficient understanding in that regard based on the filings of the Parties concerning the *Motion*, as well as the *Disclosure Statement* that was filed in support of the *Plan*. The Debtors in this case are or were all direct or indirect subsidiaries of Halliburton Company ("Halliburton"). *See Disclosure Statement*, Doc. No. 48 at 15. Due to various contracts, mergers and acquisitions, or joint ventures that occurred over the years, the Debtors or their predecessors may have become liable to provide indemnity to certain third-parties for certain asbestos-related claims. *Id.* at 23. Although the details are not entirely clear, it appears that beginning in 1988 one of the Debtors in the case, Dresser Industries, Inc., now known as DII Industries LLC, entered into a merger which resulted in it assuming historical liabilities for NLI's "petroleum services business," which included the former NLI Baroid Division. *See* NLI's *Reply* to the Judson *Response* at ¶18; *Tremont, LLC v. Halliburton Energy Servs., Inc.*, 696 F. Supp. 2d 741, 752-63 (S.D. Tex. 2010). Halliburton is the successor-in-interest to these Baroid liabilities. *Id.*

Several defined terms under the *Plan* must be considered when interpreting the scope of the *Channeling Injunction*. First, the protection of the *Channeling Injunction* extends to "Debtor-Affiliated Protected Parties," which is defined as being comprised of several sub-groups. *See Disclosure Statement*, Exhibit A at ¶62, Doc. No. 2086. One of these sub-groups, the one to which NLI allegedly belongs, are "Debtor-Indemnified Protected Parties," which are in turn defined in relevant part as:

> ... those entities listed on <u>Exhibit 17</u> to the Plan, but only to the extent that such entity is alleged to be liable for an Asbestos Unsecured PI Trust Claim....for which a Debtor, Halliburton, or a Halliburton Current Affiliate has agreed, or is obligated by operation of law, to indemnify such Debtor-Indemnified Protected Party.

*Id.* at ¶63. Looking next at Exhibit 17 to the *Plan*, which is self-described as a list of Debtor-Indemnified Protected Parties, the following is the relevant entry:

> NL Industries, Inc., but solely as it relates to Asbestos PI Trust Claims and Silica PI Trust Claims arising out of Baroid-related products or operations and bentonite-mining related products or operations.

Doc. No. 1513 at Exhibit 17.

These are the pertinent terms which must be considered in construing the *Channeling Injunction*. NLI seeks the Court to focus only on the "relates to" phrase found in Exhibit 17, pointing out that courts have consistently given that phrase a broad construction. Thus, according to NLI, even if it turned out that Baroid Division production at the Manchester Facility during the relevant time was only a small fraction of the overall operations, the Judson claim would still relate to "Baroid-related products or operations and bentonite-mining related products or operations," and thus be subject to the *Channeling Injunction*. *Reply* at ¶5. This position might, of course, be taken to an extreme.

Suppose, for instance, that Kenneth Judson had only spent a total of one hour in the presence of any Baroid/Bentone[9] products during the entire time he worked at the Manchester

---

9  In this Opinion, the Court uses the term "Baroid/Bentone" as a short-hand reference to the phrase "Baroid-related products or operations and bentonite-mining related products or operations" as set forth in Exhibit 17, and as thereby incorporated into the *Channeling Injunction*. Based on argument at the hearing on the *Motion*, the Court understands that there may be issues as to the distinction between the two product lines, whether they were produced by the same division of NLI, which of the products may have been produced at the Manchester Facility, etc. *See Transcript of Hearing,* March 10, 2014, at Document No. 21. By its shorthand use of the "Baroid/Bentone" term the Court does not mean to imply any decision on or resolution of such issues. Determination of such issues is left for the State Court Action in the first instance.

Facility, while having spent hundreds of hours in the presence of non-Baroid/Bentone products. Would his claim still be one that "related to" and was arising from Baroid/Bentone products and operations for purposes of the *Channeling Injunction*? The Court pressed NLI's attorney on this point at the hearing on the *Motion*, and while he conceded that this would be a harder case, he appeared to stick to the position that it would still be related to and thus enjoined.

The Court does not find NLI's argument convincing for several reasons. First, while the phrase "related to" does undoubtedly connote a broadly defined causal connection, it cannot be without limits. In construing a similar phrase in the injunction that was at issue in *Travelers*, for example, the Supreme Court noted that there had to be a "cutoff at some point" where the connection in question would be "thin to the point of absurd." 557 U.S. at 149. NLI's failure to provide any recognition of such a limit, or any principled way to delineate such limit, counts against it.

Second, and more significantly, NLI's position would essentially result in a construction of the *Channeling Injunction* that reads the word "solely" completely out of it. That word, however, is as much a part of the *Channeling Injunction* as the "related to" phrase seized upon by NLI, and it was apparently included to reflect the fact that DII Industries, now Halliburton, was responsible for only certain asbestos-related liabilities of NLI, not all of them. To simply ignore the word "solely" would seem to give NLI more protection than that to which it is entitled.

A third reason for rejecting NLI's argument harkens back to the jurisdictional issue that was discussed briefly above, where the Court recognized that the *Channeling Injunction* likely pushed at least to the outer edge of the Court's authority. That conclusion also cautions against an

13

overly-expansive construction in favor of NLI. *See, e.g., In re The 1031 Tax Group, LLC*, No. 10 CIV. 2799, 2011 WL 1158445 (S.D.N.Y., Mar. 29, 2011) (declining to interpret a channeling injunction in a manner that would exceed the subject matter jurisdiction of the Court).

A final reason for rejecting NLI's position stems from Judge Fitzgerald's comment in *Pittsburgh Corning, supra*, that the burden of articulating the scope of an asbestos channeling injunction as a requisite for confirmation is borne solely by the plan proponents. Where such an injunction is not sufficiently articulated to the point that there is uncertainty as to its scope, it behooves the Court to construe that uncertainty most strongly against the plan proponent, or in this case, the party aligned with the plan proponent.

While NLI ignores the term "solely," Judson understandably makes it a centerpoint of her argument. As she states in her response:

> Because the express terms of the channeling injunction in the Confirmation Order protect NLI solely from claims arising solely from Baroid and Bentone-related operations, the plain meaning of the provision is that the injunction does not protect NLI from claims arising from other sources.

*Response* at ¶25. Judson thus seems to be arguing that the *Channeling Injunction* will only protect NLI from those claims where the claimant's only exposure occurred with respect to Baroid/Bentone operations. This position seems to go too far the other way and could also lead to extreme results.

For instance, if it is ultimately shown that only 1% of Kenneth Judson's asbestos exposure at the Manchester Facility involved operations other than Baroid/Bentone, does that nevertheless mean that the *Channeling Injunction* would be completely ineffectual to protect NLI

14

because the claim did not arise "solely" from Baroid/Bentone operations? Under the formulation as stated in the *Response*, the answer would appear to be "yes." The Court likewise cannot agree with an interpretation of the *Channeling Injunction* that would produce such a result.

The Court finds that the most reasonable interpretation of the scope of the *Channeling Injunction* lies somewhere between the two positions proposed by the Parties. The key lies in the definition of "Debtor-Indemnified Protected Parties" found in Exhibit A to the *Disclosure Statement*, quoted above, which would seem to be central to an understanding of the intended scope of the *Channeling Injunction*, but which neither Party has addressed in its filings on this matter. That definition provides that the entities listed in Exhibit 17, such as NLI, are protected, but "only to the extent" they are alleged to be liable on a claim for which a Debtor or Halliburton has agreed, or is obligated by operation of law, to indemnify such entity. In other words, rather than the either/or approaches urged by the Parties, the definition recognizes that an apportionment process of some kind may be necessary if a claim that includes both Baroid/Bentone and non-Baroid/Bentone exposure is made against a protected party, with a part of the claim being protected by the *Channeling Injunction* and a part not protected.[10]

---

10   Looking beyond the present case, the Court acknowledges the possibility that any finding to the effect that injury from non-Baroid/Bentone exposure is outside the scope of the *Channeling Injunction* could lead to abuse. In other words, claimants could be tempted to "plead around" the *Channeling Injunction* by alleging non-Baroid/Bentone exposure even though there is no reasonable basis for doing so. The mere fear of such potential for abuse, however, is not a justifiable reason to deny Judson relief in the present case. Furthermore, the Court would note that *Fed.R.Civ.P. 11*, *Fed.R.Bankr.P. 9011* and their state court counterparts are always available for courts to address any such abuse occurring in future cases following this decision. Speaking for itself, the Court will bluntly state that any attempt coming before it to avoid the *Channeling Injunction* through abusive means will be appropriately dealt with.

The Court makes no pretense of having any expertise on the question of exactly how such an apportionment process should be done. It is, however, well aware that asbestos-related claims litigation has been going on for decades and routinely involves allegations of multiple exposures, to multiple products of multiple defendants, often extending over lengthy periods of time, all of which are alleged to have played some part in a non-divisible injury to the plaintiff. In these complex situations, the courts hearing the cases have been forced by the circumstances presented to develop methods for apportioning liability among the defendants in a fair and equitable manner. *See, e.g.*, M. Green, *A Future for Asbestos Apportionment?*, 12 Conn. Ins. L.J. 315, 318-25 (2006) (discussing the approaches courts have taken to apportion asbestos liability).

What does the above mean with respect to the *Motion*? In general, it means that the Court will largely defer to the proceedings in the State Court Action provided they are conducted in a reasonable and proper manner, while holding open the possibility that NLI may return here at any time to renew its efforts to enforce the *Channeling Injunction* if it does not believe this standard is being met. Despite this deference, a number of comments can be made that will perhaps provide the state court with some general guidance as to how this Court would anticipate the State Court Action proceeding.

First, the Court views the disclaimer language included by Judson in the Second Amended Petition to be significant, and assumes that it will prevent Judson from introducing or relying upon any evidence of asbestos exposure from Baroid/Bentone operations at the Manchester Facility in proving her case. If Judson is unable to show any non-Baroid/Bentone exposure through admissible evidence, as NLI contends will be the case, then the Court assumes her claim against NLI

16

in the State Court Action will be dismissed in due course, whether on summary judgment or otherwise. Second, if Judson is able to show sufficient non-Baroid/Bentone exposure occurred to establish liability against NLI, then there must be some opportunity provided for NLI to introduce evidence of Baroid/Bentone exposure so that the judge or jury can take that into account when making a determination as to an apportionment of liability between and among the Baroid/Bentone and non-Baroid/Bentone functions of NLI. Third, NLI must be given an appropriate offset or credit as against any overall liability that may be found to reflect that portion of the liability which is found to be attributable to Baroid/Bentone operations, and thus under the protection of the *Channeling Injunction*. (Similarly, should Judson ever pursue a claim against the Asbestos Trust for any Baroid/Bentone exposure, there should be an offset or credit to reflect any recovery against NLI that she obtains in the State Court Action).

The court in the State Court Action will be charged with carrying out the proceeding in accordance with the general principles discussed above but beyond that is free to act in accordance with applicable law as it may determine. If at any time NLI believes the state court has failed to do so in a manner that implicates a breach of the *Channeling Injunction*, as interpreted herein, it may seek further relief from the Court. An appropriate Order follows.

Dated: April 24, 2014

_____
Thomas P. Agresti, Judge
United States Bankruptcy Court

Case administrator to serve:

    Michael G. Zanic, Esq.
    David Asido, Esq.
    K&L Gates, LLP
    K&L Gates Center
    210 Sixth Avenue
    Pittsburgh, PA 15222

    Carla Guttilla, Esq.
    The Nemeroff Law Firm
    U.S. Steel Tower
    600 Grant Street, Ste. 600
    Pittsburgh, PA 15219

    Robert W. Phillips, Esq.
    The Nemeroff Law Firm
    U.S. Steel Tower
    600 Grant Street, Ste. 600
    Pittsburgh, PA 15219